# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF KENTUCKY
# CENTRAL DIVISION
# LEXINGTON

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF AN **APPLE IPHONE WITH PHONE NUMBER 267-356-0885 AND SERIAL NUMBER GR6YH046KPHF**, CURRENTLY LOCATED AT: FBI Lexington Resident Agency evidence room located at 1648 McGrathiana Parkway, Suite 250, Lexington, Kentucky 40511 | **Case No. 21-MJ-5313-MAS** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, David J. Lowery, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, that is, an officer of the United States who is empowered by law to conduct investigations of and make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.  I am also a "Federal Law Enforcement Officer" within the meaning of Rule 41(a) (2) (C) of the Federal Rules of Criminal Procedure.

3.       I am a Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, and have been so employed since July 2011.  I am currently assigned to the Lexington Resident Agency, within the Louisville Field Office of the FBI, and am assigned to investigate white collar matters.  I have received training from the FBI Academy in Quantico, Virginia, which covered a variety of investigative techniques, including interviewing, report writing, and an overview of legal statutes and criminal laws.  I have received training in searching, seizing, and securing computers and other electronic devices including cell phones. I have personally conducted and assisted in investigations involving wire fraud, mail fraud, and bank fraud.

4.       Forensic Accountant Tressa Whittington also provided information contained in this affidavit. She is a Forensic Accountant with the Federal Bureau of Investigation, United States Department of Justice, and has been so employed for approximately ten years. In her capacity as a FBI Forensic Accountant, she participates in the identification, examination, and analysis of financial data associated with white collar crime, including money laundering. Additionally, she collaborates with investigators in gathering evidence, preparing affidavits, and executing search warrants and/or court orders associated with financial analyses.  She has been a Certified Public Accountant (CPA) since 2007 and Certified Fraud Examiner (CFE) since 2012. She is currently assigned to the FBI Louisville Field Office.

5.       This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.      The property to be searched is an Apple iPhone Xs Max, serial number

GR6YH046KPHF, hereinafter the "Device."  The Device is currently located at the FBI

Lexington Resident Agency evidence room located at 1648 McGrathiana Parkway, Suite

250, Lexington, Kentucky 40511.

7.      The applied-for warrant would authorize the forensic examination of the

Device for the purpose of identifying electronically stored data particularly described in

Attachment B.

## JURISDICTION

8.      The U.S. Attorney's Office for the Eastern District of Kentucky and the

FBI have been investigating wire fraud (18 U.S.C. § 1343) and threatening

communications (18 U.S.C. § 875) involving Austin Genay primarily within the Eastern

District of Kentucky but the investigation also reaches to the Philadelphia, Pennsylvania

area where a target resides and where I believe he conducted his criminal activity from.

Genay has intimate pictures of Ralph Tackett, the treasurer of a church in Georgetown,

Kentucky, and has succeeded in extorting a considerable amount of money from Tackett,

specifically, from December of 2015 until in or about July of 2019, by threatening to

expose Tackett's telephonic homosexual relationship and online interactions with Genay.

9.      Tackett, the victim, resides in Georgetown, Kentucky, located in Scott

County, Kentucky and has at all relevant times of this investigation and continuing to the

3

present day.  Although on at least one occasion he was out of state on vacation with his family when he was extorted by Genay, the vast majority of the criminal activity was perpetuated against Tackett while Tackett was living and working within the Eastern District of Kentucky.  Furthermore, Tackett stole the money he used to pay Genay from his church and place of employment, which is also located within the Eastern District of Kentucky.  The church is also a victim, in my eyes, as it has suffered a significant pecuniary loss as a result of Genay and Tackett's crimes.

10.     Previously, after I lawfully searched the Device in 2019, I seized evidence within the scope of the warrant I obtained from the Eastern District of Pennsylvania, transported the Device back to the Eastern District of Kentucky, reviewed it, and created a copy of that evidence seized here, in the Eastern District of Kentucky.

11.     The investigated offenses occurred in part in Scott County, Kentucky and the Device is now in Lexington, Kentucky, and I know both locations are within the Eastern District of Kentucky. This Court therefore has jurisdiction to issue the requested search and seizure warrant on the Device because it is "a court of competent jurisdiction," specifically "a district court of the United States (including a magistrate judge of such a court) . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## **PROBABLE CAUSE**

12.     In the course of this investigation, the U.S. Attorney's Office for the Eastern District of Kentucky and the FBI have uncovered evidence to support violations

4

of illegal wire transfers (18 U.S.C. § 1343) and threatening communications (18 U.S.C. § 875) involving Austin Genay as well as Tackett's own crimes of wire fraud and embezzlement which are indirectly related to this request and need not be detailed.

13.     On or about July 15, 2018, the FBI Louisville Field Office, Lexington Resident Agency, received information from a reliable source in the banking industry that Ralph Tackett, the Treasurer of the Victory Life Church (VLC), in Georgetown, Kentucky, in the Eastern District of Kentucky, was writing checks from the VLC account and depositing said checks into his (Tackett's) personal account. In June 2021, Forensic Accountant Whittington completed the review of a voluminous amount of digital and financial records and established, beyond any reasonable doubt in my estimation and belief, that Tackett paid over $500,000 from the Eastern District of Kentucky through myriad financial transactions to Austin Genay, located in the Philadelphia, Pennsylvania area.

14.     Forensic Accountant Whittington reviewed records from Western Union, Square, Inc., Central Bank, Square, Inc., and Google Pay, obtained through valid legal process from custodians of records (these are not the only records reviewed by Forensic Accountant Whittington in the course of this investigation).  She found that, based on her review of the records, beginning in August, 2015, and continuing through May, 2018, Ralph Tackett sent Austin Genay approximately $110,500 via Western Union money transfers.   In addition, beginning in December, 2017 and continuing through April, 2019, Tackett paid out approximately $77,700 to Genay via the Square Cash application.  Also

starting March, 2018, and continuing into July, 2018, Tackett paid out approximately $24,500 to "Barbara Genay", "Michael Genay", and "Scott Croft" through the Square Cash application. According to Square, Inc., these additional Square accounts are related to Genay through common credit cards linked to the Square accounts. Also, beginning in August, 2016 and continuing through January, 2018, Tackett paid out at least $245,000 to Genay via Google Pay. As a result of this portion of the investigation alone, it appears the manner and means that Genay employed throughout his scheme to extort money from Tackett varied over time.

15.    Genay has communicated a number of ways with Tackett in the course of committing these suspected crimes: 1) he has used FaceTime, an iPhone feature, 2) he has used the Facebook application on his phone to find Tackett and Tackett's family members and has messaged Tackett's wife to then use to show Tackett that he had found his wife on social media; 3) he has used text messaging features, 3) he has used various applications to send messages in conjunction for asking for money including Square Cash, Google Pay, and Apple Pay to manage and demand payments, and 4) he has called Tackett's personal cell phone.

16.    I have more than reasonable and probable cause to believe that the Device contains evidence of violations of 18 U.S.C. § 1343 (Wire Fraud) and 18 U.S.C. § 875 (Threatening Interstate Communications) and that the identified property was used in part, in committing said violations. I know this, because I already searched approximately a gigabyte of data and seized only what I believed to be relevant and

within the scope authorized by the U.S. District Court for the Eastern District of

Pennsylvania warrant and original Attachments A and B from the Device.  See Exhibit 1.

I properly entered a return for said information seized.  I previously, with the help of

RCFL, burned a copy of the seized data from the Device onto a hard drive.  I documented

a smaller portion part of what I seized as screenshots which I attached to one of my

reports on the matter and have, as an example, attached one small excerpt of screen shots

of a conversation I previously discovered on the Device.  See Exhibit 2.  I verified this

text message conversation found on the Device seized from the person of Austin Genay

was between Genay and Tackett because I verified the telephone numbers associated with

their respective devices with the individuals themselves among other ways; however, as

the Court will see the contact name reflected in Genay's phone that is associated with

Tackett's number is "Khloe."  I personally called the number associated with Genay's

Device and witnessed it ring prior to seizing it.  I have also called 859-533-9067 on

multiple occasions throughout the course of this investigation and this number, reflected

on page 1 of Exhibit 2, corresponds to Tackett's personal cell phone.

17.     On July 24, 2019, I interviewed Austin Genay who explained he initially

met Tackett on a website homosexual men use to meet each other called "cam4.com" and

Tackett provided his iPhone number and then they could use the FaceTime feature to

speak.  Genay told me he and Tackett had an arrangement in which Tackett would send

money to Genay in exchange for naked pictures of Genay and video sessions with Genay

while Genay was naked.  Genay subsequently began asking Tackett for money for his

7

personal expenses.  Later on, Genay looked at Tackett's personal Facebook page and
discovered Tackett had a wife and kids.  This made Genay "mad" and from that point
forward, if Tackett refused to send Genay money, then Genay would tell Tackett he was
going to tell his wife and kids about their relationship.  He further explained to me that he
would send screen shots he had saved from their FaceTime session to Tackett if he
refused to send Genay money when Genay asked.  Genay explained he did use some of
the money Tackett sent him for items he claimed he needed it for but that he used a good
portion of it to fund his addiction to Percocets.  Genay has no other form of income.  On
one occasion, Genay sent Tackett a screen shot of a Google map which indicated he was
in Ohio and that he was on his way to Tackett's residence to see him.  Genay was never
actually in Ohio, he admitted. He was just mad at Tackett, and thought Tackett may pay
him money if Tackett believed he was closer to Tackett's residence than Philadelphia.

18.    Genay also told me he kept the pictures he sent to Tackett anytime he was
mad at him in his email, ajaee93@aol.com.  He kept them in this email account because
Genay has a boyfriend, and he did not want his boyfriend to see the pictures.  This email
was identified as having been used in relation to his crimes involving Tackett and
evidence of this is on the Device as well.  See Exhibit 2 at 1.

19.    On Tackett's phone, I observed an image of a tow truck that Genay sent to
convince him his vehicle was being towed.  Based on my training and experience with
individuals who engage in online fraud schemes, individuals often use online stock

8

images and send them to the victims to make their scams more believable to their victims. I believe the images, one in particular was a picture of a tow truck, was copied from a stock online image by Genay and then sent to Tackett as "proof" that Genay needed the money he was demanding.  In previous wire fraud investigations I have conducted, records of or information about similar devices' internet activity including caches, browser history showing web pages with photos fraudsters used, and search terms in Internet search engines have provided evidence that lies and misrepresentations were used in the course of the commission of said crimes.

20.     Genay told me he looked for information about Tackett and his family on the internet and, because this iPhone was the only device he appeared to have and personally use in furtherance of the suspected crimes, I believe evidence that Genay was trolling for information about Tackett, Tackett's residence, and Tackett's family members is on the Device.  Furthermore, because my investigation has revealed Genay primarily used his personal cellular device in furtherance of this scheme, evidence of the manner and means he employed, such as usage data and other information stored on the Device and within the applications folders associated with the applications that Genay used to exploit Tackett will provide evidence about when he started and stopped demanding money via various applications and when he shifted tactics, for example.  This will help to develop a chronology of Genay's criminal activity that is being investigated, at least as far back as the data on this particular device reaches.

9

21.    Genay was identified by Tackett with Genay's self-photo posted on Instagram with account name "italianpapi9," and the investigation established Genay used the Google account associated with italianpapi9@gmail.com to receive funds from Tackett. The Facebook account with Facebook user ID 100001861778173 is the account Genay used to contact Tackett as well as Tackett's wife on at least one occasion.

22.    When I first searched this Device, I found specific evidence of these exchanges described; therefore, I have direct personal knowledge that evidence of these crimes exists on the Device.  Recent representations of a cooperating witness and questions from the prosecutor prompted my follow up review of the lawfully seized data to perfect possible charges.  I retrieved the hard drive and attempted to access said data to ensure I had captured proof of the specific instances and manner of the crimes suspected and discovered the disc containing said data was corrupted. I consulted RCFL (FBI IT help), but the data could be not accessed, is inaccessible and; therefore, lost. Austin Genay, whom I have identified, remains the subject of this investigation and, having reviewed this same Device previously, I know evidence of his crimes are contained in the Device.  I make this request given these new circumstances because of the passage of time between the initial search and my recent discovery in August 2021, that I could not access the copy of the seized evidence I had made.  This month, September 2021, I learned the data on the hard drive cannot be recovered.  I now seek to search the Device once more and seize only what this Court will allow.

10

23.     Also, since the initial search, because a complete picture of the financial evidence in this case has been established, Tackett has been able to provide, through counsel, more specific information about the particular crimes under investigation.  The scope of this investigation; however, has not changed and the evidence on this Device, I believe, is critical to the lawful progression of this ongoing investigation, and more critically now, the resolution of this case.  On information and belief, the Device must only be accessed and searched, again, pursuant to a lawful order, and the seized information reviewed in accordance with the scope of a new seizure warrant as this Court directs.

24.     The Device is currently in the lawful possession of the FBI.  It came into the FBI's possession in the following way: I took the Device from the person of Austin Genay during the execution of a warrant for search and seizure exhibited.  I searched the Device pursuant to that lawful order.  I secured the device in our evidence room. Based on my experience, I believe officers may conduct a more detailed search of an electronic device after it was properly seized so long as the later search does not exceed the probable cause articulated in the original search warrant and the device remained secured, and that is true even if the officers conduct an initial search soon after the device's seizure but wait months or years to conduct a more intensive search.  Therefore, while the FBI might already have all necessary authority to re-examine the Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws at this time.

11

25.     The Device has been retrieved from storage at FBI Louisville Headquarters Evidence Room located at 12401 Sycamore Station Place, Louisville, Kentucky 40299 and is now in the FBI Lexington Resident Agency evidence room located at 1648 McGrathiana Parkway, Suite 250, Lexington, Kentucky 40511. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.  I placed the Device into "Airplane Mode" and entered into evidence after I conducted a Cellbrite extraction of data from the iPhone.  I then reviewed the extraction and stored the seized data on an external hard drive, all in accordance with my training and experience.  For all of these reasons, I believe that the electronically stored information described in Attachment B pertinent to these two crimes is still recorded on the Device described in Attachment A.

26.     The device will remain on "Airplane mode" during the search. "Airplane mode" prevents the device from entering a live cellular network. Therefore, the search of the device will be limited to information stored directly on the phone.  This means, for example, I will not have access to the owner's email account or Facebook account while I conduct the search.

27.     I have only provided information I believe is sufficient to support probable cause and jurisdiction over this request before this Court; however, I can provide additional details and answer any questions to fortify this request if necessary.

## **TECHNICAL TERMS**

28.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash

15

memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.   IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and

international borders, even when the devices communicating with each other are in the same state.

29.     Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

30.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

31.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

17

h.  I have already searched the Device before and found said evidence on the device; however, the copy I made of that data is corrupted and I believe what I discovered previously remains on the Device.

i.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

j.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

k.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

l.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer

18

behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

m.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

n.   I know that when an individual uses an electronic device to make threatening communications and related financial transactions, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

32.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium,

19

that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

33.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

34.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## NO REQUEST FOR SEALING

35.     Based on the advanced stage of the investigation, I do not believe it is necessary to seal the order or papers in support or furtherance of this application but understand the Court may, in its normal course, choose to do so.  While these documents do discuss an ongoing criminal investigation that is not entirely public; Austin Genay has been interviewed and is aware he is a subject of the investigation, Ralph Tackett has disclosed his conduct to his family and is no longer in fear of being extorted, and

communication between the two has ceased.  Accordingly, I defer to the Court on the

question of whether to seal these documents.

Respectfully submitted,

/s/ David J. Lowery
David J. Lowery
Special Agent
FBI

Subscribed and sworn to before me
on October 4, 2021:

UNITED STATES MAGISTRATE JUDGE

21